**SYBRON TRANSITION CORP. and KERR MANUFACTURING COR-PORATION, Plaintiffs,**

v.

**SECURITY INSURANCE COMPANY OF HARTFORD, Defendant.**

No. 92C779.

United States District Court, E.D. Wisconsin.

Jan. 14, 2000.

John E. Flanagan, Douglas P. Dehler, Michael Best & Friedrich, Milwaukee, WI, for Plaintiffs.

James S. Smith, Joseph D. McDevitt, Borgelt Powell Peterson & Frauen, Milwaukee, WI, William M. Savino, M. Paul Gorfinkel, Rivkin Radler & Kremer, Uniondale, NY, Donald C. Brown, Hogan & Hartson, Washington, DC, Jeffrey A. Schmeckpeper, Kasdorf Lewis & Swietlik, Milwaukee, WI, David L. Batty, Crowell & Moring, Washington, DC, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

In a court trial held this past August, plaintiffs Sybron Transition Corp. and Kerr Manufacturing Corp. sought a declaration that defendant Security Insurance Company of Hartford was liable for all or most of a $1.3 million settlement plaintiffs made to the survivors of Dr. Alan Press. Press died from mesothelioma caused by his exposure in dental school to asbestos products manufactured by Kerr, Sybron's subsidiary. Insurer Security argued that Press's injuries occurred over a span of about nineteen years and that the $1.3 million had to be prorated across all of those years, reducing Security's portion because it had insured plaintiffs for only a fraction of that time period. Sybron and Kerr (together "Sybron") argued that injury occurred mainly during the effective dates of Security's policies and that the $1.3 million should be allocated all or mostly to those years.

On August 13, 1999, at the end of the court trial, I announced my findings of fact and conclusions of law. I found that injury had occurred to Press in ten of the nineteen years, including the years plaintiffs were insured by defendant, and that the settlement amount was to be prorated evenly across the ten calendar years. Based on my findings of fact and conclusions of law, judgment was entered in favor of plaintiffs for $390,000 on their claim; in favor of Security in the amount of $110,000 on its counterclaim for reimbursement of the $500,000 it had paid toward the Press settlement while reserving its right to contest liability; and in favor of plaintiffs on Security's counterclaim for reimbursement of defense costs, which Security had essentially abandoned by the start of trial.

Having fully satisfied no one with my decision, I now must consider the motions

made by all parties to alter or amend the findings and judgment.

## I. RULE 59(e) AND RULE 52(b)

Federal Rule of Civil Procedure 59(e) permits a party, within ten days after entry of judgment, to move to alter or amend that judgment. The available grounds for a Rule 59(e) motion are newly discovered evidence, an intervening change in the controlling law, or a "manifest error of law" by the court. *Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir.1998). The rule essentially enables a district court to correct its own errors and thus avoid unnecessary appellate procedures. *Divane v. Krull Elec. Co.*, 194 F.3d 845, 848 (7th Cir.1999).

Likewise, Fed.R.Civ.P. 52(b) also indicates that following a court trial a party, within ten days after entry of judgment, may move for amendment of the court's findings. Like Rule 59(e), Rule 52(b) is not intended to allow the parties to relitigate old issues, to advance new theories, or to rehear the merits of a case; instead, the recognized grounds for such a motion include manifest error of fact or law by the trial court, newly discovered evidence, or a change in the law. *Diebitz v. Arreola*, 834 F.Supp. 298, 302 (E.D.Wis.1993). Because amendment of the court's findings often may affect the judgment, a Rule 52(b) motion is often made in conjunction with a Rule 59(e) motion. *Id.*

## II. SECURITY'S RULE 59(e) MOTION

■ Security asserts that I committed a manifest error of law in my oral decision when I treated partial years of injury or insurance coverage the same as full years for purposes of prorating the settlement amount. Most troublesome says Security is my allocation of a full year of liability to a policy Security issued to Sybron for only one month in January 1971. According to Security, not only is my treatment of that policy based on a misreading of *Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d Cir.1995), *modified in impertinent part on denial of reh'g*, 85 F.3d 49 (2d Cir.1996), but it also conflicts with the law of the case, as I had set out in a summary judgment decision in March 1999 that Sybron would be responsible for the February 1 to December 31, 1971 time period when it was insured by American Mutual Liability Insurance Company, which is now insolvent. Security points out that my final decision treats Security as if it had insured Sybron for the full 1971 year and lets Sybron off the hook for the American Mutual period.

Security is right.

In my oral decision following trial I stated:

Next issue is partial years. Although Security provided coverage to Sybron under a policy covering all of 1969, Dr. Press was only exposed to asbestos for a few months at the end of the year. Similarly, only a few months at the start of 1973 are implicated and Dr. Press died during the first few months of 1988. In addition, Security's 1971 policy lasted only one month of that year. The Second Circuit in *Stonewall* found that the full policy limits were available to the insured under polices that, like Security's 1971 policy, lasted only a portion of a year due to cancellation or an extension of a few months. In other words, if an occurrence occurred or happened during the part of the year in which the policy was in effect, the insurer was liable for the full aggregate amount—of the aggregate limit.

As a corollary, I believe it is consistent to say that if any part of an injury has occurred during a policy period, even if not for the full year, the insurer nevertheless should be liable for the full

aggregate limit. As related at 73 F.3d at 1202, the district court had prorated between triggered policies on a yearly basis, although no one objected to that formula to cause the Second Circuit to review it. . . .

.     .     .     .     .

Four, therefore, my fourth conclusion of law is that the full policy amounts for 1969, 1971 and 1988 are to be considered notwithstanding the fact that a policy was only for part of a year or that injury occurred only during a portion of each of a year.

(Tr. at 25–27.) At the time I rendered this decision I thought that this "corollary" followed from *Stonewall.*

In *Stonewall,* certain policies, like the 1971 policy here, were either canceled before the stated policy period had expired or extended for a period beyond the stated expiration date, leaving them in effect for a fraction of a year. The Second Circuit upheld the general rule that the full annual aggregate limits of these part-year policies were available to the insured for whatever fractional period they were in effect. The *Stonewall* case involved thousands of claims, which were going to max-out most insurance policies. The insurers of fractional years argued that because their policies lasted for only partial years, the aggregate limits of their policies should have been reduced accordingly. The Second Circuit, however, stated that "[n]othing in the language of Stonewall's policies provides for proration of annual aggregate limits where the policy is in effect for only a fraction of a year." *Stonewall,* 73 F.3d at 1216.

I misread this ruling as referring not only to policy *limits,* but to policy *periods* as well. But it did not. Rather than ruling that a partial-year policy would be treated as if it were in effect for a complete year, the Second Circuit ruled mere-ly that the entire policy limit of a partial-year policy would be available to indemnify the insured if such an amount were reached by the claims involving injury while the policy was in effect. The court apparently acknowledged that a partial-year policy should be allocated only for its part of the year when it wrote "Moreover, in exchange for a reduction in premiums, Stonewall received a reduction in the amount of time it was on the risk," *id.* at 1217, and when it acknowledged that the insured "purchase[d] an additional policy with the full $5 million limit applicable for [a] four-month period," *id.* The district court in deciding the same issue had similarly pointed out that the insured was "entitled to recover up to the full policy limits for the shortened period." *Stonewall Ins. Co. v. National Gypsum Co.,* No. 86 CIV 9671(JSM), 1992 WL 188433, at *1 (S.D.N.Y. July 29, 1992). The district court's quote from another opinion in the case distinguished the policy limits and policy periods arguments: " 'The policy language describes the consequences of cancellation; it reduces the period of coverage and reduces the premium paid by the policyholder. There is no provision for the reduction of aggregate limits in the event of cancellation.' " *Id.* (quoting *Asbestos Ins. Coverage Cases,* No. 1072, slip op. at 6–7 (Cal.Super.Ct. Jan. 24, 1990)).

After *Stonewall* the argument Security cannot make is that because its $500,000 1971 policy was in effect for only one month, then only 1/12 of its limit of $500,000, or $41,667, is available to Sybron. Rather, the full $500,000 limit is available. In other words, if on January 15, 1971 Press had been hit and killed by a car driven by a Kerr employee, and Sybron settled for $1,300,000, Security could not argue that as far as policy limits go only $41,667 was available to Sybron; $500,000 would be available under *Stonewall.* Nor could Se-

curity argue that less than $500,000 would be available to pay its portion of any allocated liability for injury that spans several years. For instance, if $3,000,000 of liability were allocated for injury continuing from January 1 through December 31, 1971, Security again could not argue that less than $500,000 was available under its policy in the event such an amount were attributed to January. *Stonewall* does *not*, however, foreclose the argument that Security is liable for only $\frac{1}{12}$ of any amount allocated for 1971 based on the fact that its policy was only in effect for $\frac{1}{12}$ of the year; i.e. that in the last example, using an even allocation formula, that it was liable for only $250,000.

■ Under New York's injury-in-fact approach, a policy in effect in January 1971 cannot be called upon for payment for bodily injury that occurs in February, June, or December 1971. The policy's coverage for "bodily injury" "during the policy period," (*see, e.g.*, Trial Ex. 36 at § 1 & definition of "occurrence"), by definition excludes from coverage liability for injury that occurs outside the policy period. *Stonewall Ins. Co. v. National Gypsum Co.*, No. 86 CIV 9671(JSM), 1992 WL 163180, at *1 (S.D.N.Y. June 24, 1992) ("Clearly, in providing coverage for an occurrence which results in injury during the policy period, the insurance policy by definition excludes from coverage liability for injury which occurs outside the policy period."); *accord Northern States Power Co. v. Fidelity and Cas., Co.*, 523 N.W.2d 657, 662 (Minn.1994) ("The essence of the actual injury trigger theory is that each insurer is held liable for only those damages which occurred during its policy period; no insurer is held liable for damages outside its policy period.").

My oral decision does conflict with my March 24, 1999 Decision and Order as well, in which I wrote:

> [P]laintiffs assert that the time period during which they were insured by American Mutual Liability Insurance Company should be excluded from any calculation or allocation because it no longer is in existence....
>
> Any deletion of the American Mutual policy period would shift, unfairly, more of any liability onto the shoulders of plaintiffs' other insurers, who in no way are at fault for American Mutual's insolvency .... [P]laintiffs themselves are stuck with any liability attributed to the year during which they were insured by American Mutual.

(Decision and Order of 3/24/99 at 25–26.) I noted that the previous presiding judge on this case concluded the same thing back in 1995, and no intervening case law changed the result. While I refrained in the March 24 decision from determining at that time how I would prorate liability, I clearly decided that whatever basis for proration I would eventually choose, Sybron would be liable for the share of American Mutual.

I still believe the above-quoted portion of my March 24 decision was correct. *Accord United States Fidelity & Guar. Co. v. Treadwell Corp.*, 58 F.Supp.2d 77, 96, (S.D.N.Y.1999) ("If one of the insurers is insolvent, the insured is saddled with that insurer's share of the liability."). My oral decision, though, in fact imposed liability upon Security and eliminated Sybron's responsibility for the period of American Mutual's policy, making the above-quoted language a nullity. This effect simply confirms that my fourth conclusion of law cannot be right. Therefore, upon reconsideration, my conclusion that for purposes of a time on the risk allocation, Security's 1971 one-month policy should be treated as if it were in effect for a full twelve months cannot stand. Security will be allocated

only ½₂ of the portion of the $1,300,000 Press settlement allocated to 1971.

While Security's Rule 59(e) motion focuses on the 1971 calendar year, my reconsideration regarding that year necessarily draws into question my allocation of liability as a full year for 1969, when Press started dental school in September 1969 and the parties have stipulated that he was not exposed to asbestos before that date; 1973, when Press ended dental school in May; and 1988, when Press died in early April. It would be difficult to alter Security's liability for 1971 while letting my treatment of those partial years as full years stand.

As authority for my rounding-up to full calendar years for years in which Press suffered injury for only a portion of the year, I relied on case law and a law review article that discussed "years" on the risk, or "years of coverage triggered." *See, e.g.,* Michael G. Doherty, *Allocating Progressive Injury Liability Among Successive Insurance Policies,* 64 U. Chi. L.Rev. 257, 260 (1997) (advocating allocation of liability based on an insurer's years of coverage relative to the total number of years of coverage triggered). Upon another review of pertinent case law, however, while the authorities do discuss allocation or proration on a yearly basis, they do not specifically address, let alone hold, that partial-year allocation is improper. Several cases refer to "time on the risk" rather than or in addition to "years on the risk." *Treadwell,* for instance, described this method of allocation as "the time-on-the-risk method," finding not only that "the time-on-the-risk method has been applied by the vast majority of courts allocating liability, including every court to have considered the issue under New York law," *Treadwell,* 58 F.Supp.2d at 105, but also that Doherty, *supra,* concluded "that time on the risk is the proper method," *id.* While the *Treadwell* court went on to hold that Treadwell was obligated to contribute toward payment of asbestos claims "based on the number of years it was uninsured," *id.,* the previously quoted language indicates its understanding that years were not necessarily mandated—a court may instead use whatever measure of time is appropriate. In *Lafarge Corp. v. National Union Fire Ins. Co.,* 935 F.Supp. 675, 686 (D.Md.1996), the district court read the *Stonewall* decisions (both appellate and district court) as indicating that triggered policies' obligations should be prorated "based upon their respective triggered time periods." Thus, while allocation to each insurer (or a self-insured party) based on time on the risk is used in several cases, nothing mandates allocation by year as opposed to month or as opposed to day. Prorationing based on years is likely used and discussed most often because that generally is how insurance policies are written.[1]

Sybron contends that this is one reason to deny Security's motion—why should I change from years to months and stop there rather than going to days? And how

---

1. One of the cases I cited in my March 24 order as support for my holding that prorationing based on time was not mandatory under New York law, but that other factors could be used, also support the current holding that if a time-factor is chosen the period of time does not have to be in years. In *National Casualty Insurance Co. v. City of Mount Vernon,* 128 A.D.2d 332, 515 N.Y.S.2d 267, 271 (App.Div.1987), where a man sued the insured claiming he was falsely imprisoned and the term of the imprisonment began during one insurance policy period and ended seven days into another, the New York Supreme Court Appellate Division found that the second insurer's duty to indemnify for any damages paid to the man "extend[ed] only to damages sustained by [him] as a result of his incarceration on January 1, 1983, until January 7, 1983." The case can be read to justify a calculation based on days where appropriate.

can it be manifest error to use years when no lesser time period is mandated by case law? The simple answer here is that except for the months in which Press first noted symptoms and died, months in fact are the unit of time the parties presented to me in their stipulations or at trial. The parties stipulated, for instance, that Press attended dental school and was exposed to asbestos from Kerr's product during all periods between September 1969 to May 1973. Therefore, allocation by months on the risk is the most precise allocation formula that the record will support. While Sybron is upset by the fact that Security is attempting to secure the "holy grail" that I denied them in my oral decision, having accepted that I misread *Stonewall* in regard to 1971, I cannot ignore applying my corrected view to the other partial years.[2]

As a result, my decision of August 13 is amended to hold for proration of liability evenly across trigger periods of September 1969 through May 1973 (45 months) and January 1984 until April 1988 (51 months[3]), for a total of 96 months. Security was on the risk for 17 months. Dividing $1,300,000 by 96 months equals $13,541.67 per month. Security's share, therefore, is $230,208.39. The judgment shall be amended accordingly.

## III. SYBRON'S RULE 59(e) AND RULE 52(b) MOTION

Sybron's post-judgment motion has three parts: a request for clarification of one of my findings, a request for a more plaintiff-friendly calculation of the amounts awarded, and a request for an award of attorneys' fees.

### A. Clarification of Finding of Fact Number 38

In my oral decision I found that Press suffered injury-in-fact in 1986, 1987, and 1988. The Second Circuit in *Stonewall*, 73 F.3d at 1203–04, though, held that under New York law the year 1986 and subsequent years should be disregarded for purposes of any allocation of liability for asbestos-related diseases if asbestos liability insurance was unavailable.

Whether Sybron qualified for this exclusion of the years 1986 through 1988 was covered at trial, and I made certain findings of fact on the matter. I found based on the evidence that because primary insurance coverage was more expensive than excess coverage, "beginning in 1978 and continuing until at least 1988 and thereafter Sybron decided to purchase only excess insurance coverage rather than primary insurance policies." (Tr. of 8/13/99 at 16.) I found that beginning in 1986 insurance companies generally and Sybron's excess insurer in particular began to insert in their policies asbestos exclusion clauses. (*Id.*) And, importantly, I found that "between 1–1–86 and 4–1–88 Sybron showed no interest and made no attempt to purchase primary insurance coverage for liability. . . . Sybron also, dur-

---

2. Sybron also argues that because the evidence presented at trial shows that Security itself internally allocated its $500,000 payment toward the Press settlement as $168,000 for 1969, $166,000 for 1970, and $166,000 for 1971, I should allow the judgment to stand. How Security internally documented the payment cannot usurp New York law regarding allocation under the injury-in-fact approach, however.

3. In one respect, the allocation will be by days. Press first noted chest pains on July 6, 1987. I found that his mesothelioma tumor had been growing for three and a half years, taking injury-in-fact back to January 6, 1984. Press then died on April 8, 1988. Because Press died in early April 1988 and the eight days of that month essentially offset the six days in January 1974, counting both January 1984 and April 1988 as full months seems unfair. I therefore am counting January 1984 and April 1988 together as one month.

ing that same period, showed no interest and made no attempt to purchase primary insurance coverage for liability resulting from asbestos-related injury." (*Id.* at 17–18.)

I then set forth finding of fact number 38, which, as transcribed, reads as follows:

Thirty-eight, on the basis of all of this evidence, I find it more likely than not that between 1–1–86 and 4–1–88 coverage for asbestos-related liability would have been available to Sybron. Because of Sybron's policy of self-insuring instead of purchasing primary coverage, Sybron would not have purchased any primary insurance polices covering asbestos-related liability.

(*Id.* at 18.) As transcribed, the finding of fact makes little sense, as it does not follow at all from the preceding findings. Sybron asks for clarification of the finding, believing that I meant to say that "between 1–1–86 and 4–1–98 coverage for asbestos-related liability would *not* have been available to Sybron," (R. 210 at 7), as it seems to fit better in context.

The request for clarification will be granted and finding 38 will be amended pursuant to Fed.R.Civ.P. 52(b), because due to either my misstatement in court or a mistranscription by the court-reporter the above-quoted language is not what I intended. Sybron's suggested alteration, however, is rejected. I intended to make no finding either way regarding the availability after 1–1–86 of coverage for asbestos-related liability. My focus for finding 38—and finding 39 for that matter—was whether the availability of asbestos-related liability insurance made any difference to Sybron. My recollection and notes from which I read my findings indicate that finding 38 should instead read as follows, with the alterations underlined:

Thirty-eight, on the basis of all of this evidence, I find it more likely than not

that *if* between 1–1–86 and 4–1–88 coverage for asbestos-related liability would have been available to Sybron, because of Sybron's policy of self-insuring instead of purchasing primary coverage, Sybron would not have purchased any primary insurance policies covering asbestos-related liability.

Finding 39 then also makes much more sense, as it follows on that thought: "*if* coverage asbestos-related liability had been available to Sybron between 1–1–86 and 4–1–88, Sybron would only have purchased such coverage as part of its purchase of policies providing excess coverage . . . ." (Tr. at 18 (emphasis added).)

## B. Inclusion of 1986, 1987, and 1988 in the Allocation Formula

█ As stated above, under *Stonewall* 1986 and subsequent years should in certain circumstances be disregarded for purposes of any allocation of liability for asbestos-related diseases. I concluded as a matter of law that Sybron did not qualify for this "*Stonewall* exception"—that "under the rationale of *Stonewall* and the cases cited therein that it is not unreasonable to include the years 1986, '87 and '88 among those in which Sybron's self-insured coverage is triggered." (Tr. at 29.)

Sybron contends that I made a manifest error of law in interpreting *Stonewall* and *Olin Corp. v. Insurance Co. of North America*, 986 F.Supp. 841 (S.D.N.Y.1997), because I looked not at whether insurance was available in the marketplace but rather at Sybron's intent to purchase insurance. During trial I indicated my belief that the post–1985 asbestos insurance issue actually breaks down into two parts: whether asbestos insurance was available to Sybron at all and whether Sybron negotiated such coverage away or chose not to obtain it. Sybron agrees that both of these issues are

to be considered, but argues that *Stonewall* mandates that I address the two questions in a very particular order: first, whether asbestos insurance was available to Sybron; and then, if and only if the answer to this question is "yes," whether the insured made a conscious decision not to obtain such insurance. Sybron believes that *Olin* also leads to this required ordering. I skipped right to the second question, which Sybron asserts was manifestly wrong.

In *Stonewall,* 73 F.3d at 1203–04, the Second Circuit modified the judgment of the trial court so as not to apply the proration-to-the-insured approach to years after 1985, the point at which asbestos liability insurance ceased to be available. The trial court had found that the insured bargained away coverage by accepting asbestos exclusion clauses during those years. The Second Circuit thought this was "not a realistic view of the situation," *id.,*—that there was "no reason to believe that any bargaining occurred with respect to the asbestos exclusion clauses," *id.* at 1204. The Second Circuit did not discuss the particular evidence regarding insurance contract bargaining (or lack thereof) that was in the record (other than that asbestos exclusion clauses were not in the insured's policies for years after 1985) which led it to the conclusion that the trial court's holding was not supported.

The court's discussion, however, strongly suggests that if evidence existed indicating that an insured voluntarily chose to forego insurance rather than attempting unsuccessfully to obtain it, there would be no reason not to require the insured to share in allocated liability. The Second Circuit pointed out, for instance, that proration-to-the-insured is done "to oblige a manufacturer to accept a proportionate share of a risk that it elected to assume," *id.,* and quoted favorably from a New Jer-

sey case stating that " '[w]hen periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable,' " *id.* at 1203 (quoting *Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974, 995 (N.J.1994)). Nothing in *Stonewall* mandates that the two questions— unavailability of insurance and voluntary assumption of the risk by not purchasing insurance—be answered only in the order that Sybron asserts and thus that the question of a party's assumption of risk by not purchasing insurance is relevant only after a finding that insurance is unavailable.

*Olin* does not mandate Sybron's ordered test, either. In that case, the district court found that the fact that insurance was available in the marketplace to companies like Olin mooted the need to consider a morass of evidence regarding what Olin had done to attempt to obtain insurance and the question of whether Olin had been dilatory. The case does not command that the two issues for consideration be answered in any particular order; in that case the easier question simply eliminated the need for any further analysis. *Olin* thus supports my view that both questions have to be answered favorably to Sybron for the *Stonewall* exception to apply and the failure of Sybron to win *either* question is dispositive. While the *Olin* court did say that the intent issues were more difficult in that case and that it was "inconceivable that *Stonewall* is intended to thrust the court into the kinds of evidentiary mazes that have been presented," *Olin,* 986 F.Supp. at 844–45, no such difficulties existed in the case before me, where Sybron's intent was actually a much easier question than whether insurance was available in the marketplace.

*Olin,* in fact, offers further support for my opinion that the two questions for the *Stonewall* exception may be considered mutually exclusively rather than seriatim. The *Olin* court started with the proposition that under a general comprehensive liability insurance policy construed pursuant to New York law, the insurer is normally liable only for injury occurring during the time covered by the policy. Thus, following the terms of the insurance contract as closely as possible, an insurance company like Security, having issued policies in 1969, 1970, and 1971, could not be apportioned liability for injuries occurring in 1986 and beyond. *See id.* at 843. Recognizing that the *Stonewall* court provided an exception to change the result that would otherwise occur, the *Olin* court stated "that *Stonewall* should be applied narrowly, and I want to make that clear without any mistake. It is my view that *Stonewall* should be applied so as to achieve a result as close as possible to what would be the result under the insurance contracts." *Olin,* 986 F.Supp. at 844. Applying the *Stonewall* exception narrowly means that Sybron must have both questions answered in its favor, not that a favorable outcome on the unavailability of insurance question ends the matter.

I do not believe my interpretation of *Stonewall* and *Olin* is incorrect. In any event, the issue is at least quite debatable, meaning that my interpretation cannot be manifest error. Because I found that even if asbestos coverage were available, Sybron would not have purchased it, Sybron cannot qualify for the *Stonewall* exception. Thus, the years 1986, 1987, and 1988 remain in the allocation formula.

## C. Attorneys' Fees

Sybron filed this lawsuit in Wisconsin state court as a declaratory judgment action under Wis. Stat. § 806.04, and the case was removed to this court based upon diversity jurisdiction. While New York law governed the coverage questions in this case, the parties do not dispute that Sybron's motion for an award of attorneys' fees is governed by Wisconsin law. *See Scottish Guarantee Ins. Co. v. Dwyer,* 19 F.3d 307, 312 (7th Cir.1994) (case brought as federal declaratory judgment action in which court found controlling Wisconsin substantive law as set forth in *Elliott v. Donahue,* 169 Wis.2d 310, 485 N.W.2d 403 (1992), which relied on Wis. Stat. § 806.04); *see also Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (in a diversity case a federal court generally applies the law of the state in which it sits); *Doe v. Roe No. 1,* 52 F.3d 151, 154 (7th Cir.1995) (same). I must apply Wisconsin substantive law as declared by the state's legislature or highest court. *See Erie,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. I thus must predict how the Supreme Court of Wisconsin would apply state law in this case. *Kaplan v. Pavalon & Gifford,* 12 F.3d 87, 89 (7th Cir.1993).

Wisconsin follows the "American rule," meaning that attorneys' fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor; each party to a lawsuit bears its own costs of litigation. *Elliott v. Donahue,* 169 Wis.2d 310, 323, 485 N.W.2d 403 (1992); *Kremers–Urban Co. v. American Employers Ins. Co.,* 119 Wis.2d 722, 744, 351 N.W.2d 156 (1984). The Supreme Court of Wisconsin has allowed "only limited and narrow exceptions to the American Rule." *Gorton v. Hostak, Henzl & Bichler, S.C.,* 217 Wis.2d 493, 512, 577 N.W.2d 617 (1998) (internal quotation marks omitted).

One such exception is when an insurance company wrongfully refuses to defend a claim against an insured. In such a case the insured may be awarded attor-

neys' fees expended in establishing coverage, pursuant to the Wisconsin declaratory judgment statute, Wis. Stat. § 806.04. *Elliott*, 169 Wis.2d at 318–25, 485 N.W.2d 403. The availability of an award of such attorneys' fees is not as clear cut, however, if, as here, the insurance company has not breached its duty to defend.[4] *See* Arnold P. Anderson, *Wisconsin Insurance Law* § 7.9 (4th ed.1998) (discussing the uncertainty in this situation).

In *Elliott*, an insured and his insurer were sued by a third-party over an automobile accident. The insured tendered his defense to the insurance company, which denied coverage and advised the insured to hire an attorney at his own expense. The insurer requested a bifurcated trial to determine the coverage issue separately from the insured's liability. But while obtaining a bifurcated proceeding, the insur-

er failed to request a stay of the liability claims, so the proceedings progressed simultaneously. When the trial court entered a judgment finding coverage under the policy the insurer immediately assumed defense of the insured.

The insured set forth two separate arguments pertinent to the present case to support his position that he was entitled to an award of attorneys' fees from both the coverage and underlying defense proceedings. First, he argued that the insurer had breached its duty to defend and that attorneys' fees were damages resulting from that breach. *See id.* The Supreme Court of Wisconsin found that the insurer had indeed breached its duty to defend when it failed to request a stay of the liability proceedings while coverage was still in dispute,[5] and that the attorneys'

---

4. My finding of fact number 9, which came from a stipulation by the parties, was that "Sybron tendered the underlying Press litigation to Security and Security defended Sybron and paid all defense costs incurred in defending that case." (Tr. at 4–5.) In finding of fact number 10, also based on the parties' stipulation, I found that Security funded its part of the Press settlement "pursuant to a mutually executed Non–Waiver Agreement, under which each party expressly reserved the right to seek later reallocation and/or the recovery of monies contributed to this settlement." (*Id.* at 5.) The nonwaiver agreement also allowed Security to seek reimbursement of its costs of defending the *Press* litigation. (R. 210 Ex. ¶ 2.)

Sybron suggests that even though Security defended it in the *Press* litigation, it has since breached its duty to defend by counterclaiming for its defense costs, essentially repudiating that it had any duty to defend or that coverage was even fairly debatable. According to *Professional Office Buildings, Inc. v. Royal Indemnity Co.*, 145 Wis.2d 573, 585, 427 N.W.2d 427 (Ct.App.1988), where a coverage trial does not precede the underlying case on liability and damages, the insurance company may be required to furnish a free defense to its insured. *See also Benjamin v. Dohm*, 189 Wis.2d 352, 366, 525 N.W.2d 371 (Ct.App.

1994) (same). An insurer thus might indeed be considered in breach of its duty to defend by counterclaiming for defense costs from the underlying case. *Cf. Radke v. Fireman's Fund Ins. Co.*, 217 Wis.2d 39, 45, 577 N.W.2d 366 (Ct.App.) (discussing option of insurer and insured entering into nonwaiver agreement in which the insurer agrees to defend but can contest *coverage—not* indicating that insurer can later contest duty to defend, too), *review denied*, 219 Wis.2d 923, 584 N.W.2d 123 (1998).

Sybron, though, has given up any right to assert that Security's counterclaim for defense costs breached its duty to defend, because in the nonwaiver agreement Sybron signed it gave Security full permission to do so.

5. Sybron contends that the insurer in *Elliott* was found not to have breached the duty to defend. The court, however, held that even though the insurer had not breached its duty to defend when it initially denied coverage, it nevertheless breached the duty when it failed to follow the required procedure of bifurcation and stay, forcing the insured to simultaneously defend both proceedings: "[A]n insurer may need to provide a defense to its insured when the separate trial on coverage does not precede the trial on liability and

fees from the defense of the third-party claim flowed from that breach; it refrained, though, from stating that the attorneys' fees from the insurance coverage dispute did as well. Second, the insured argued that principles of equity demanded that an insured who successfully establishes coverage recover attorneys' fees related to that dispute. The Supreme Court of Wisconsin agreed with this argument, holding that under equity principles and Wis. Stat. § 806.04(8),[6] which allows further relief in a declaratory judgment action, the insured was entitled to recover attorneys' fees from the coverage litigation. *See Elliott,* 169 Wis.2d at 314, 324, 485 N.W.2d 403. According to the court,

> The insurer that denies coverage and forces the insured to retain counsel and expend additional money to establish coverage for a claim that falls within the ambit of the insurance policy deprives the insured [of] the benefit that was bargained for and paid for with the periodic premium payments. Therefore, the principles of equity call for the insurer to be liable to the insured for expenses, including reasonable attorney fees, incurred by the insured in successfully establishing coverage.

*Id.* at 322, 485 N.W.2d 403.

The *Elliott* court never stated that an award of attorneys' fees for coverage disputes in any way depended on the insured's first argument—i.e. whether the duty to defend has been breached. Instead, it framed the question before it simply as "whether an insured may recover attorney fees incurred in successfully defending coverage under an insurance policy," *id.* at 316, 485 N.W.2d 403, and similarly always framed its answer in general terms applicable to any coverage dispute, stating, for instance: "We conclude that the supplemental relief under § . 806.04(8) may include a recovery of attorney fees incurred by the insured in successfully establishing coverage under an insurance policy," *id.* at 324, 485 N.W.2d 403. The court discussed equitable considerations arising from coverage disputes and failures to defend interchangeably. *See id.* at 322–23, 485 N.W.2d 403 (discussing when the insurer denies coverage and forces the insured to retain counsel and expend additional money to establish coverage, but pointing to a quote that discusses breach of a duty to defend).

The principles of equity identified by the *Elliott* court arose because a liability insurance policy "represents a unique type of legally enforceable contract." *Id.* at 320, 485 N.W.2d 403. The court recognized that in return for the premiums paid by an insured, an insurance company assumes contractual duties of both defense and indemnification, *see id.* at 320–21, 485 N.W.2d 403, and stated that its holding "preserves for the insured the benefit of indemnification and defense that was contracted and paid for," *id.* at 325, 485 N.W.2d 403, suggesting that a failure of either duty would raise the equitable concerns allowing an award of attorneys' fees. The reason the *Elliott* court determined

damages.... Heritage did not provide such needed defense ...." *Elliott,* 169 Wis.2d at 318, 485 N.W.2d 403 (internal quotation marks and citation omitted).

6. Section 806.04(8) provides:
   **(8) Supplemental Relief.** Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application therefor shall be by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith.

that equity warranted invoking the supplementary relief provisions of that statute was that the insured should not have to pay more than premiums to obtain *either* coverage or a defense to which it is legally entitled: "the insured should have to pay nothing more than the periodic premium to obtain the benefits of indemnification and defense for claims described in the policy." *Id.* at 322, 485 N.W.2d 403. This equitable principle applies equally and independently to the insured's separate rights of indemnification and defense. The insured contracted and paid premiums for both.

The *Elliott* court also referred to *Kremers–Urban,* a case in which no third-party litigation expenses were involved at all, *see Kremers–Urban,* 119 Wis.2d at 745, 351 N.W.2d 156, and the issue presented was only "whether an insured who institutes a declaratory judgment action to determine existence of coverage under the liability insurance policy, is entitled to attorney's fees incurred in the course of bringing the declaratory judgment action," *id.*—the same issue as presently before me. The Supreme Court of Wisconsin in *Kremers–Urban* had found that Wis. Stat. § 806.04(10) did not entitle the insured to recover attorneys' fees, as such fees were not "costs" under that subsection. The court expressly took no position, though, on whether attorneys' fees were allowed under any other subsection of § 806.04, specifically noting and quoting subsection 806.04(8), but indicating that neither party argued for application of that subsection and therefore the holding was limited to subsection (10). *See Kremers–Urban,* 119 Wis.2d at 747 & n. 9, 351 N.W.2d 156. After discussing *Kremers–Urban,* the *Elliott* court indicated it was answering the question left open in that case, "conclud[ing] that § . 806.04(8), Stats., permits a recovery of attorney fees in this case because the recovery is proper under the

principles of equity." *Elliott,* 169 Wis.2d 310, 485 N.W.2d 403.

Some recent cases have suggested that *Elliott* may be limited to situations involving breach of the duty to defend. In *DeChant v. Monarch Life Insurance Co.,* 200 Wis.2d 559, 547 N.W.2d 592 (1996), the Supreme Court of Wisconsin relied upon tort principles to award attorneys' fees to an insured in a first-party bad faith action, finding that such fees constitute part of the compensatory damages resulting from the insurer's conduct. In discussing *Elliott,* however, the *DeChant* court noted that the insurer in *Elliott* had denied defense of a third-party lawsuit, forcing the insured to obtain independent counsel. The *DeChant* court described *Elliott* as

stand[ing] for the proposition that courts have the equitable power to award attorney's fees to insured in limited circumstances. However, our result in *Elliott* was firmly grounded within the statutory authority found in Wis. Stat. § 806.04(8) (1993–94). *Elliott* involved a declaratory judgment action in which the insurer breached its duty to defend. Therefore, although some of the rationale expressed in *Elliott* is supportive, we decline to extend *Elliott* beyond its particular facts and circumstances.

*DeChant,* 200 Wis.2d at 569, 547 N.W.2d 592 (footnote omitted). *DeChant,* though, left unclear exactly what the "particular facts and circumstances" of *Elliott* are. The above-quoted language can be construed as meaning simply that *Elliott* would not be extended beyond the declaratory judgment situation because the statutory basis for awarding attorneys' fees disappears, or it can be construed as meaning that a breach of the duty to defend is required.

In *Gorton,* 217 Wis.2d at 512, 577 N.W.2d 617, the Wisconsin Supreme Court reiterated that it would not extend *Elliott*

beyond its particular facts and circumstances to lawsuits between non-insurance fiduciaries and beneficiaries—in *Gorton* an attorney and client—and noted that *Elliott* in fact is the only instance in which the Wisconsin Supreme Court has ever interpreted § 806.04(8) to allow a grant of attorneys' fees.[7]

In addition, the Wisconsin Court of Appeals recently held that an award of fees under *Elliott* is indeed narrowly limited to situations involving a breach of the duty to defend:

> In *Elliott*, the court determined that the insured was entitled to an award of attorney's fees incurred because the insurer breached its duty to defend. That is not the case here. There was no breach of a duty to defend. Further, our supreme court has declared that *Elliott* should not be extended "beyond its particular facts and circumstances." *DeChant*, 200 Wis.2d at 569, 547 N.W.2d at 595. Attorney's fees should only be awarded in limited circumstances: when an insurer breaches its duty to defend an insured.

*Ledman v. State Farm Mut. Auto. Ins. Co.*, 230 Wis.2d 56, 70, 601 N.W.2d 312 (Ct.App.1999) (other citations omitted), *petition for review filed*, No. 98–0267 (filed Sept. 14, 1999).

Sybron contends that this quote from *Ledman* is dicta, because the Wisconsin Court of Appeals had already found that no coverage existed under the policy at all; the attorneys' fees award thus was already reversed for that reason and the discussion of *Elliott* and *DeChant* was superfluous. The *Ledman* court, though, simply provided alternate holdings. The existence of alternate holdings does not make either one dicta. *See United States v. Gordon*, 253 F.2d 177, 191 (7th Cir.1958) ("the holding was not dicta ... for Judge Major simply treated with an alternative ground of decision"); *Goldin v. American Airlines, Inc.*, No. 90 C 768, 1990 WL 77630, at *3 n. 4 (N.D.Ill. May 21, 1990) ("We disagree with the defendant's argument that this part of Judge Bua's opinion is dicta because he also ruled on an alternate ground. Judge Bua specifically ruled on both of the plaintiff's arguments for remanding the case .... The mere fact that the plaintiffs won both issues does not mean that either holding, when seen individually, is dicta.").

■ Intermediate appellate court decisions are helpful but not binding regarding what the Wisconsin Supreme Court would do in a similar case. *Kaplan*, 12 F.3d at 89; *see* Charles Alan Wright, et al., *Federal Practice and Procedure* § 4507 (2d ed.1996). Therefore, whether the Wisconsin Supreme Court would hold that the broad language of *Elliott* still applies to the present situation, or would instead hold that *Elliott* is severely restricted to require a breach of the duty to defend as stated in *Ledman* and as suggested by *DeChant* and *Gorton*, is actually a tough question.[8] In this case I do not need to

---

7. The Wisconsin Court of Appeals awarded attorneys' fees for the coverage action in *United States Fire Insurance Co. v. Good Humor Corp.*, 173 Wis.2d 804, 496 N.W.2d 730 (Ct. App.1993). Although the duty to defend was breached in that case, the court, like the Wisconsin Supreme Court in *Elliott*, used very broad language rather than indicating that breach of the duty to defend was required. The Seventh Circuit awarded attorneys' fees

in *Scottish Guarantee*, 19 F.3d at 312. That case also involved an insurer's refusal to defend, but again the court did not note that fact as being a requirement.

8. Both choices find support elsewhere. *Compare Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wash.2d 37, 811 P.2d 673, 681 (Wash. 1991) (en banc) ("[W]e believe that an award of fees is required in any legal action where

answer it, though. I assume that *Elliott* is still good law. But even if I can award Sybron attorneys' fees under Wis. Stat. § 906.04(8), the award is discretionary rather than mandatory, and in my discretion I do not believe an award of fees to be justified.

*Elliott* indicates that the award may be made if an insured successfully establishes coverage. It is true that Sybron brought this declaratory judgment action to finally

determine coverage due to Security's reservation of rights in the nonwaiver agreement, and that rather than conceding that its policies were triggered at all Security counterclaimed, denying any liability whatsoever and seeking recovery of both the entire $500,000 it provided toward the *Press* settlement and all of its costs of defending Sybron in the *Press* matter. But while Security technically did dispute whether there was coverage at all,[9] that

the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract, regardless of whether the insurer's duty to defend is at issue."), *and Hayseeds, Inc. v. State Farm Fire & Cas.*, 177 W.Va. 323, 352 S.E.2d 73, (W.Va. 1986) (awarding fees to insured in first-party coverage case over property damage claim), *with* 14 Lee R. Russ, *Couch on Insurance* § 205:85 (3d ed. 1999) ("[A]ttorneys' fees and costs incurred in maintaining or defending a declaratory judgment action to determine coverage are only awarded if there was a breach of the duty to defend in the underlying litigation.").

9. Security states in its brief opposing the attorneys' fees motion that it "never disputed" the existence of coverage:

The Court will recall that, in its pretrial submission, Security stated that it sought to recover at trial only approximately $401,000 of the $500,000 payment which it had made. If Security was denying coverage, it would have sought to recover the full $500,000! Indeed, it would not even have made such a substantial contribution to the settlement in the first place! The fact is that Security never even demanded repayment of any part of its $500,000 contribution until Sybron instituted this lawsuit. Moreover, Security defended Sybron in the *Press* case, and made no affirmative claim for reimbursement of those defense costs. In other words, Security never denied that coverage existed. It simply disputed the *extent* of the coverage which it owed to Sybron.

(R. 218 at 2.) This statement is belied by Security's answer and counterclaims themselves, in which Security asserted not only the lack of coverage but even of a lack of a duty to defend, justifying reimbursement of defense

expenses. (*See* R. 11 at 3) (Security "alleges that there was no coverage for the plaintiffs under any policy of insurance issued by this answering defendant" and that "there was no responsibility for any payments being made in the underlying *Press* action, nor was there a duty to defend said action."). Not until submissions to the court on August 9 and 10, 1999 did Security admit that the policies it had issued to Sybron covering the years of *Press's* exposure were triggered. (*See* R. 197 at 4 ("Dr. Press sustained actual injury at all times between his initial exposure to asbestos in 1969 and his death in 1988."); R. 198 at 4 ("Security admits that ... the Security policies issued during 1969–71, are triggered ....").)

The fact that Sybron brought suit first rather than Security and the fact that Security contributed $500,000 to the *Press* settlement bear no weight. In the parties' Partial Funding and Non–Waiver Agreement dated April 30, 1992, Security and Sybron agreed that Security's defense of the *Press* litigation and contribution to the settlement did "not constitute any admission of coverage, liability, obligation, o[r] duty under any policy issued by SECURITY." (R. 210 Ex. ¶ 2.) Security "expressly reserve[d] all rights and defenses available to them, including the right to seek recovery from SYBRON, ... for any sums paid in settlement of the PRESS LITIGATION," and in defending Sybron in the *Press* litigation. (*Id.*) Sybron agreed that it would hold off filing any coverage litigation against Security until the *Press* settlement had been paid. (*Id.* ¶ 6.) The fact that Security contributed toward the *Press* settlement in no way meant that it was not disputing coverage, or such agreements would have been unnecessary. Litigation was contemplated and expected by both sides; it was just a matter of who filed first.

was hardly the main issue in the case, especially over the last two years since the stay was lifted and for which Sybron requests fees. Allocation was the greater point of contention during this time— whether *Stonewall* required me to find injury in every year from Press's exposure to death, whether *Stonewall* required pro rata allocation based on time on the risk as opposed to another factor, and whether the years 1986, 1987, and 1988 should be thrown out for purposes of allocation. *Elliott*'s talk of equities for an insured who needs to successfully establish coverage do not have as great an attraction when coverage is really an open and shut issue and the parties genuinely differ only about the dollar-amount.

Sybron's counsel states in an affidavit that because of the uncertainty over whether Security would be seeking the defense costs, he prepared witnesses and listed documents on the exhibit list on that issue. But the matter had to occupy only a short time, as it would have been hard for Sybron to lose even if it tried. Security would have been hard-pressed to convince me that coverage of damages arising from the *Press* case was not possible or arguable. *See School Dist. v. Wausau Ins. Cos.*, 170 Wis.2d 347, 365–65, 488 N.W.2d 82 (1992) (court looks to the four corners of the complaint to decide whether facts alleged therein raise the *possibility* of coverage under the insurance policy). While Sybron's counsel was correct to prepare himself on the issue, the amount of such preparation paled in comparison to the allocation issue.

Plaintiffs' counsel also states that because of Security's refusal to stipulate that its policies were triggered until the eve of trial, he had to prepare as if Security would contest exposure, for instance reviewing thousands of pages of documents from the *Press* litigation to find documents showing exposure and injury and preparing for possible defenses such as the "expected and intended" defense. In April 1993, however, Security stipulated that "[f]or purposes of this litigation, Security ... will not contend that Dr. Press'[s] mesothelioma had not been caused or not likely to have been caused by exposure to the Kerr product," (R. 28 ¶ 12), and that there was no evidence of Press's exposure to the Kerr product outside of dental school, (*id.*).[10] Armed with these stipulations;. the knowledge that Press's mesothelioma had a very short latency period; and the testimony of Security's own witnesses, Mary Fortado and Dr. Samuel P. Hammar, regarding Press's exposure and how injury results from exposure; Sybron had an extremely solid case for establishing injury based on exposure during the Security policy periods. Again, the time spent on this issue had to be relatively small when compared to the allocation issues. As to the possibility of affirmative defenses, Sybron indicates that those concerns arose from discovery Security took in early 1999, but that Security never actually asserted the matters as affirmative defenses. While Sybron says it "incurred significant expenses in defending against these latest allegations," it is not specific as to how it could have spent much time defending on matters that had never been pled or really pursued by Security in any fashion other than its discovery requests.

"Coverage" matters as opposed to "allocation" matters, in my view, made up only a small fraction of this case over the last few years. And as far as allocation goes, even if determining the exact amount of

---

10. Security indicated, however, its belief that Press was not exposed to asbestos during some portions of his dental school education and developed mesothelioma at some time other than during dental school.

coverage rather than the fact of coverage itself qualifies an insured for fees under *Elliott*, Sybron has not been so "successful" regarding allocation as to equitably receive them. Sybron failed to succeed on the post–1985 asbestos exclusion issue, and it failed to convince me that I should use a proration formula that placed greater liability on the first two years of Press's injury. It sought $1,300,000 from Security, or at least a much larger chunk than $230,208.39.

In sum, while Security may have delayed a formal stipulation regarding the triggering of its policies until on the verge of trial, I do not think that fact altered substantially how this case progressed or how counsel for Sybron prepared, as allocation, not coverage, appeared to be the major issue for quite some time. And as far as the allocation goes I cannot say that Sybron successfully prevailed regarding the actual amount imposed on Security. Therefore, I do not believe it equitable to make Security pay Sybron's attorneys' fees, even if Wisconsin law allows me to do so.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED that:**

1. Sybron's motion under Rules 52(b) and 59(e) is **GRANTED IN PART AND DENIED IN PART:**

a. Sybron's motion is **GRANTED** to the extent that, pursuant to Fed. R.Civ.P. 52(b), finding of fact number 38, on page 18 of the August 13 transcript of my oral decision, is amended to read as follows:

Thirty-eight, on the basis of all of this evidence, I find it more likely than not that if between 1–1–86 and 4–1–88 coverage for asbestos-related liability would have been available to Sybron, because of Sybron's policy of self-insuring instead of purchasing primary coverage, Sybron would not have purchased any primary insurance policies covering asbestos-related liability.

b. Sybron's motion is **DENIED** in all other respects.

2. Security's motion under Rule 59(e) to amend judgment is **GRANTED** as discussed above. As a result, **IT IS ORDERED THAT** conclusions of law 6 and 7 in my August 13 oral decision are amended to reflect the following allocation instead: Dividing $1,300,000 by 96 months equals $13,541.67 per month; 17 months times $13,541.67 per month equals $230,208.39 as Security's share; because Security has paid $500,000 toward the Press settlement, it is entitled to repayment in the amount of $269,791.61.

3. Any other findings or conclusions of my August 13 oral decision contrary to the contents of this Decision and Order are amended to conform hereto.

4. The judgment in this case be amended to issue in favor of plaintiffs on their claim for $230,208.39, and in favor of Security on its counterclaim for reimbursement of the Press settlement for $269,791.61.

5. The judgment in favor of plaintiffs on Security's counterclaim for reimbursement of defense costs remains unaffected.